May it please the Court, good morning. Let's take a moment and consider the petition in this case, Ms. Chen Xiaomin. As that passenger in a speeding runaway bus hurling towards a railroad crossing, and there's an oncoming freight train, yes, there's a sign that says stop, we will know the result, destruction, injury, possibly death. But there are flashing lights and clanging bells to warn her, stop, turn back, don't proceed any further. And what are the purposes for those lights and the bells? But to save that person, a frivolous asylum application finding would also result in immigration death, if I may. But the Congress, in recognizing the severe consequences of that bar, set up a warning system, section 1158D4. I'm not talking about the substantive bar at D6, but the warnings. In this case, Ms. Chen heeded the warning and put a stop to her asylum claim. She did what the warnings were designed to do. The system worked. Let me stop you there, because it looks like she heeded the warning once she had another route to immigration relief. Prior to that time, she had been given a pretty specific warming by the immigration judge, and that didn't cause her to resist the path of say what you have to say to get in and stay in the country. So was it the warning or was it the fact that she had a plan B that suddenly worked that caused her to suddenly hit the straight and narrow and no longer adhere to her untrue story? Well, I think, Your Honor, plan B was not at the last moment. The testimony shows that she had met her future husband sometime before. And if we look at the transcript of that first hearing with that first attorney, at the very first moment she asked for a continuous, but the next hearing at the master calendar where she said where her lawyer appeared and the judge, the first immigration judge was giving the warnings, and there was a lot of equivocation going back, do we proceed, do we don't proceed? Judge, are you filing this to be froze today? Prior counsel, the first lawyer, I think, was a little bit confused. I'm not sure what was really addressed in the offer. These are not tricky factual issues. If you know, you know whether you're married and you have two children or not. You know, there are other things that can be trickier than this. But to her detriment, these are clearly not tricky things. But I guess the concern that I would have, if we were to accept your rationale that any petitioner could simply file a petition, is that there is a possibility. And that doesn't seem to be a good policy and doesn't seem to be consistent with the statute. And so I have that concern. And just so I correctly understand, too, it appears to me that you concede in your brief that her application did contain false statements. Is that correct? That's correct. So we don't need to deal with that. So, you know, that's, I can't find any case that supports your position. If I may, Your Honor, number one, the statement that the petitioner is caught in a lie. She came forth at the second master with new counsel and did not continue with the asylum application. The first lawyer has said, Your Honor, I want to supplement. And the regulations allow the petitioner to continue. And we don't know at this particular point because they did not proceed with the asylum application. Was she going to amend the application and say, I'm single, I don't have children? We don't know because we don't have a full-blown asylum application before the court. Now, to some level, she had taken advantage of the untruths already. I mean, she had been allowed to stay in the country longer than she might have been able to stay in the country otherwise simply by claiming that she was eligible for asylum and staying in the system for a certain period of time. Is there any reason why the law should encourage behavior by which, we call them petitioners here, so I'll use that term, but petitioners lie in a way that you can't fail to know. I mean, she clearly knew that the story she told wasn't being true. Now, it wasn't true. She may have been told that this is what she got to say and accepted that, but she's lying. And she gets a benefit from that. Is the system set up in such a way to say, but you can get that benefit as long as at the very last minute you peel off and find your plan B? Well, Your Honor, the 1995 regulatory changes and the 1996 illegal immigration reform act put a stop to the abuses that we've all heard about and witnessed in the asylum system. There's a 180-day clock. She cannot get the benefit of employment authorization, and she didn't in this particular case. She cannot delay and prolong the asylum application with the agency and get that work permit for five years, renewable every year as it happened before. The government appropriately instituted a life or last and first act so that people who submit asylum applications would get before the asylum officer and see the immigration judge and be out of the system. So the system is working as designed with the 1996 legislation. And if I may point out to the Court that the supplementary information to the final rule at 65 Federal Register 76.28, mentioned in our brief, specifically states that the current regulation does not contain any provisions that punish an applicant for withdrawing an asylum application. And any applicant may choose not to be punished or the government isn't seeking to punish her for withdrawing. The withdrawing is fine. It's the lying through her teeth before them that's the problem. Well, with all due respect, Your Honor, I think we have to look at the substantive law which says you are going to be penalized and forever barred from any asylum or any immigration benefits. That's not really penalizing anybody. That's just a forfeiture based on your own behavior. Well, no, Your Honor. There are other statutes in the immigration laws that address forfeiture. If I may analogize, I think a good illustrative example is the sham marriage laws at Section 204C. The original sham marriage law says the alien must have first obtained an immigration benefit, gotten the green card, and then be caught. Then the law was amended to say if you attempted to procure any immigration benefits, you're dead, you're forever barred from any immigration petition. And finally, in 1986, with the immigration marriage fraud amendments, Congress made it even clearer, 204C.2 of the Act, stating specifically, if you enter into a marriage for the purpose of evading immigration laws, the mere fact of getting married, if that's disclosed to be a sham marriage, you're finished immigration-wise. But Congress did not do that with 208D.6. Congress merely said that you must have an application where there is a final determination. And it seemed pretty clear. The Second Circuit case cited in the Governor's 20HA letter, ZHENG, Z-H-E-N-G, it's right on point. It supports our position that the petitioner, the aliens, may withdraw. It's never too late to turn back. It's not like, well, I don't know if any immigration- I'm not sure ZHENG stands for the proposition that you're saying. Didn't ZHENG just remand it, the application that is filed, and then withdrawn before a decision so that the, and then they could deal with it on the merits? I believe the Second Circuit was instructing the Board and giving the Board a chance to kind of set forth the contours as to when a withdrawal would be appropriate. We've seen this particular case- Yeah, but they weren't saying what she did was okay. Of course not. And we don't, we don't say that. We admit she did wrong and she came forth and confessed and said, forgive me, I did wrong. Let me stay. I'm now relieved. Let me say that the parameters are your relief then. I realize you want to reserve the rest of the time for a bottle, but just based on what you said, is that your current position that the only relief you're seeking is the kind of relief the Second Circuit gave in ZHENG, which is basically says, put the question back to the BIA, that you're no longer seeking an adjudication from us that says that your client is not barred. I, with all due respect, I think what I see in the ZHENG case, that there perhaps counsel, tri-counsel, had not proved the issue of the Federal Register publication of December 6, 2000, wherein the Attorney General said, we're not punishing the aliens if they withdraw. That might not have been before them. I don't know the facts. It was brief. The immigration judge chose not to follow the Supplemental Information Guidance. The BIA, summary affirmance. We don't know what the BIA was thinking. I can only think that they ignored this guidance, and I think this Court should appropriately instruct the BIA and the immigration judges that this Supplemental Information, December 6, 2000, specifically states the alien may withdraw and will not be punished. What the government wants to do is to expand 208D6 and 4 into something that was not designed by Congress. Their relief is on Capitol Hill, not with the courts. Thank you. Judge Callahan, you are absolutely right that there's no tricky factual issues in this case. The alien was given her warnings of the consequences of filing a frivolous asylum application. The application was frivolous, and she deliberately chose to proceed forward. If you read carefully, pages 70 through 74 of the record, and I won't take the Court's time to do that, you see the immigration judge is visibly concerned that this may be a frivolous asylum application, warns Miss Chen, gives her an opportunity off the record to talk to her attorney and make sure this is what she wants to do. And after that, after getting a warning, and she knows that it's a frivolous asylum application, she deliberately chooses to go ahead, and it's uncontested on the record, but she did it. That being the case, the statute should apply. An alien who knowingly files a fraudulent asylum application is permanently barred. Counsel, what's the problem with the Zeng case, where they remanded it to the BIA? I take it. What if we follow the czar, write an opinion, and then in Zeng it goes back to the BIA, and the BIA decides, for whatever reason, that it is appropriate to allow somebody to withdraw without any consequences attaching. Then we're in a funny position of having been undercut by the BIA. Hasn't the Supreme Court told us in Ventura and other cases we ought to always defer to the BIA in the first instance? Yes, Your Honor. That would be, I can't remember the name of the case, but it's in the line of Ventura. The Supreme Court would have to give deference. But we think that the Second Circuit actually misread the statute. Well, you think that, but it's nonetheless there. I mean, is this up for a petition for rehearing? Is it final in that circuit, or what? I checked with our appellate division at the Office of Immigration Litigation, and we have not made a determination yet as to whether we're going to seek further review in Zeng. If you don't, what are the consequences for this case? Well, we think that the Court should read the statute as we propose, which is that the phrase, final determination on such application, refers not to an adjudication of the merits, but simply the determination that the asylum application is frivolous. And that phrase only deals with the timing of when the permanent bar goes into effect. In other words, it's not a substantive condition for the application of the bar. It just simply says when it goes into effect. But does that not run the risk that we could come out with an interpretation of this law different than the BIA? It's possible. There's a practical problem here that I want you to think about, because this Court, more than any other of the circuits, has been chastised by the Supreme Court about not jumping ahead, making sure you let the BIA speak first. And within this Court, there are at least some numbers, including some people you're looking at today, who have made that point within our own deliberations. Now we have the Second Circuit saying, okay, send it back to the BIA. And if that stands, it puts us in kind of an awkward position to say, well, in this case, we don't need to do that, although one of our sister circuits has done so. And as Judge Trott notes, the BIA will presumably have to pass upon the question, so it's going to speak. And is there any – is there a practical reason why we ought to go forward now, despite the fact that the BIA will apparently have to deal with this question directly? I would have to say, Your Honor, that if the Court is inclined – if the Court shares the same concern that the Jean Court did, that the proper course of action would be to allow the BIA to pass on that issue in the first instance. But if the Court doesn't feel that way, I don't see the question. Well, aren't you arguing – aren't you arguing to statutory construction  Absolutely. We think that the statute's pretty clear. The statute says if the attorney general determines that an alien has filed a frivolous application, then he is permanently barred, ineligible for benefits as of the date of the final determination on such application. The word determination used in both places refers not to an adjudication on the merits, as the Petitioner argues, but only to the determination that it's – that the application is frivolous. And there's no issue in this case that it's frivolous. So your position would be that you could find an application in some other – other case. I know this is awfully law school-like, but somebody could drag an application from another case into a pending matter and say, look at this. Six years ago, here's an application. It turns out it's frivolous. So it short-circuits the present – the present petition. Is that right? I mean, any application will do, whether in this case or another case. That seems to be the way the statute is written, Your Honor. Of course, in such a situation, the immigration judge making that determination would – would require quite a bit of evidence to support his factual finding that the asylum application was frivolous. But as the statute's written, that certainly is a possibility. Not to say that it would happen. It's speculative, but it – it could. Because if you just read the statute, if the Attorney General determines that an alien has knowingly made a frivolous application for asylum, the way it's – the way it's written. Yes, it is. But as we say, the statute – we think the statute's clearly written. If the Court feels otherwise, we would say that the proper course of action would be to allow the BIA to rule on it in the first instance, as the Second Circuit did in June. Subject to your questions. Thank you. One, with respect to statutory construction, 1158d6 includes with this language effective as of the date of the final determination on such application. The phrase such application has to refer back to the application for asylum. Secondly, with respect to the intimation that the immigration judge thought the alien knew that this was a fraudulent application. If that's the case, the system should have been designed to kick in and say, let's have a determination on whether or not this is a frivolous application, and it would not waste, what, three or four years of immigration court time waiting for a marriage petition to be approved. I think the first immigration judge thought the case had been withdrawn at the very beginning. We look at transcripts. When you had the colloquy that counsel for the government pointed to, I mean, I read that transcript. You couldn't be any more explicit than the court was about saying, I see your attorney is nodding his head and telling you how to answer, but it's you're the one who's going to suffer the consequences if you're wrong. I mean, this might be the perfect test case for the government to get in front of whoever is going to decide this, because the facts seem to me to be extraordinarily strong with regard to the warnings given to your client. That's correct. There are warnings, but the warnings must do something. At what point can the warnings be taken in by the agency? At what point is your client required to tell the truth, and at what point can she lie with impunity? I mean, that's the problem. But I see if you look at the second hearing with the second immigration attorney, that lawyer said she's married, she's going to file for her husband. And on the transcript, AR-81, discernible, indiscernible. What did the lawyer say on the tape? And we are withdrawing the asylum application or we're substituting for the asylum application? We don't know. I've listened to the tape. It's not discernible. I've listened to it three times, and I can't figure it out. I was hoping I could get a better transcript and say it was definitely withdrawn. Because I think the second immigration judge was a bit concerned, as Your Honor, rightfully so, that the aliens can milk the system by delaying the process. But in this case, the application was abandoned and not prosecuted. And I obviously think the immigration judge did think the applications have been abandoned. There are no biometrics required, which are required under the new asylum laws. No hearings have been scheduled within 180 days on the merits of the asylum application. That should have been done. And thirdly, no supplemental amendments have been submitted as the first lawyer had represented. I think all that indicates that this case had been dropped from the very beginning, not when she was exposed. She was never exposed. She voluntarily came forth, as she should have, with proper advice from competent lawyers, not immigration consultants that we see represented. In fact, the signature. I think we have your position. Counsel, I have one question. The hearing in this case was almost five years ago. What's your client's status now? She's still here. I did not ask her about her medical condition. There's testimony about that. Is she married? She's still married, as far as I know. Thank you. Thank you. Thank you. The case just argued is submitted.
judges: Trott (Via Video), Clifton, Callahan